The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader.  The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
November 7, 2019

## 2019COA165

**No. 16CA1545, *People v. Baker* — Crimes — Securities — Fraud
and Other Prohibited Conduct; Evidence — Opinions and
Expert Testimony — Testimony by Experts — Opinion on
Ultimate Issue**

A division of the Colorado Court of Appeals holds that certain

expert testimony by the Deputy Commissioner for the Colorado

Division of Securities in this securities fraud case improperly

usurped the jury's role.  Specifically, the Deputy Commissioner

improperly told the jury what the defendant had and had not said,

and had and had not done, not in hypothetical terms but in terms

suggesting certainty based on credibility determinations and

assessment of evidence, some of which had not been presented to

the jury.  The expert's testimony further conveyed the impression

that she had determined that the defendant was guilty.  Because

the erroneous admission of this testimony was not harmless, the

division reverses the defendant's convictions for securities fraud and theft.

COLORADO COURT OF APPEALS                                    2019COA165

Court of Appeals No. 16CA1545
Jefferson County District Court No. 14CR2062
Honorable Philip J. McNulty, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Karl Christopher Baker,

Defendant-Appellant.

JUDGMENT AFFIRMED IN PART, REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division VII
Opinion by JUDGE J. JONES
Fox and Tow, JJ., concur

Announced November 7, 2019

Philip J. Weiser, Attorney General, Brittany L. Limes, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Rachel K. Mercer, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Karl Christopher Baker, appeals the judgment of conviction entered on jury verdicts finding him guilty of three counts of securities fraud (fraud in the sale of a security); three counts of theft ($20,000 or more); and one count of filing a false tax return. Because we conclude that the prosecution's expert witness on securities impermissibly testified to conclusions solely within the jury's province, we reverse Baker's securities fraud and theft convictions and remand for a new trial on those counts. We affirm the conviction for filing a false tax return.

## I. Background

¶ 2    Baker and his business partner formed Aviara Capital Partners, LLC (Aviara), in late 2009, planning to buy a controlling interest in a bank, purchase the bank's distressed assets (mostly loans secured by real estate), and then sell those assets at a profit when the real estate market improved.

¶ 3    To fund this plan, Aviara needed investors. Baker sought out potential investors, including four people named as victims in this case: Donna and Lyal Taylor, Dr. Alan Ng, and Stanley Douglas. According to the indictment, each chose to invest in Aviara after Baker allegedly told them the following:

1. Their investments would go toward buying a distressed bank.

2. "Class A" investors — larger, corporate investors — were already lined up.

3. The amount of their investment that they could lose was capped. (The Taylors alleged that Baker said they could lose $30,000 at most. Douglas said that he was told he could lose no more than 25% of his investment. Ng understood that, in a worst case scenario, he wouldn't make a profit.)

4. Baker wouldn't take a salary until Aviara was up and running or profitable.

5. Aviara would hold their money in escrow.

6. They would get their principal back quickly (within a year according to Ng and Douglas; within three to four months according to the Taylors).

Donna Taylor also alleged that Baker told her his mother was going to invest in Aviara.[1]

¶ 4    After the People indicated that Lillian Alves, the Deputy Commissioner for the Colorado Division of Securities, would testify at trial, defense counsel filed a motion in limine to exclude her testimony, arguing (among other things) that her proposed testimony would usurp the jury's role as fact finder, would include determinations the jurors could make themselves, wouldn't be helpful, would misstate the law, and would serve "only to bolster and re-state the charges, which of course are not evidence." The district court denied that motion.

¶ 5    At trial, each investor testified that Baker had told them that larger investors were about to jump in, there would be a limit on their potential losses, Baker wasn't taking a salary, and Aviara would hold their investments in escrow. The Taylors and Douglas also testified that Baker told them that all, or at least some, of their

---

[1] Donna and Lyal Taylor testified that Baker also told them that his mother was going to invest in Aviara. But Lyal later clarified on cross-examination that he understood the statement as a hypothetical — that Baker "would even let [his] own mother invest," not that she was actually going to do so.

investment would go directly toward purchasing the bank. And both the Taylors and Ng testified that Baker told them they would get their principal back quickly.

¶ 6    After the court qualified Alves as an expert in securities law, she testified about the Colorado Securities Act and its registration requirements, that securities law requires "full and fair disclosure," that Baker had an obligation to truthfully disclose material facts, and that the shares of Aviara that Baker sold were securities. She also testified at length about what statements or omissions Baker had made to the investors, and whether those statements and omissions were material. And she concluded that the things Baker said would happen never occurred. Defense counsel repeatedly objected to this testimony.

¶ 7    Baker didn't testify, but defense counsel vigorously attacked the investors' credibility, arguing that the statements attributed to Baker didn't make any sense, particularly in light of the comprehensive documents Baker had provided to the investors, which didn't include such statements.

¶ 8    A jury found Baker guilty of the charges noted above, but acquitted him of one count of securities fraud.

4

## II.    Discussion

¶ 9    Baker contends that the district court erred by (1) allowing Alves's testimony; and (2) allowing the prosecution to present evidence that he falsely told Donna Taylor that Aviara would register the securities it was selling, when the indictment didn't contain any such allegation. He also contends that, in the event we affirm, his theft conviction for taking $50,000 from Ng should be reduced from a class 3 felony to a class 4 felony.

¶ 10    We agree with Baker that some of Alves's testimony crossed the line between permissible and impermissible expert testimony. Because the court's error in allowing the impermissible testimony wasn't harmless, we reverse Baker's securities fraud and theft convictions. But we conclude that Alves's improper testimony didn't taint the conviction for filing a false tax return. Given the possibility that the issue may arise in the event of a new trial, we also briefly address Baker's contention that evidence that he told Donna Taylor he would register the securities impermissibly varied from the charges in the indictment.

## A. Alves's Expert Testimony

¶ 11　Baker challenges Alves's expert testimony on eight related and largely overlapping grounds, including that her testimony wasn't helpful, was speculative, misstated the law, and usurped the functions of the judge and jury. We agree with Baker that parts of Alves's testimony usurped the jury's role.

### 1. Standard of Review

¶ 12　A trial court has broad discretion to determine the admissibility of expert testimony, and we won't overturn its rulings allowing such testimony absent a showing of an abuse of that discretion. *People v. Pahl,* 169 P.3d 169, 182 (Colo. App. 2006). A trial court abuses its discretion if its decision is manifestly arbitrary, unreasonable, or unfair, or if it misapprehends or misapplies the law. *People v. Thompson,* 2017 COA 56, ¶ 91.

¶ 13　Baker preserved his argument that Alves's testimony usurped the function of the jury. Because this argument is preserved, we will determine whether any error requires reversal by applying the harmless error test. *Hagos v. People,* 2012 CO 63, ¶ 12. Under that test, we reverse only if the error "substantially influenced the verdict or affected the fairness of the trial proceedings." *Id.* (quoting

*Tevlin v. People*, 715 P.2d 338, 342 (Colo. 1986)).  To determine if that occurred, we look to whether the People have shown that there is "no reasonable possibility that [the error] contributed to the defendant's conviction."  *Pernell v. People*, 2018 CO 13, ¶ 22; *see James v. People*, 2018 CO 72, ¶¶ 18-19 (the prosecution must show that any error was harmless).  *But see People v. Rock*, 2017 CO 84, ¶ 22 (articulating the harmless error test as whether "there is a reasonably *probability* that it contributed to the defendant's conviction") (emphasis added); *People v. Roman*, 2017 CO 70, ¶ 13 n.1 (noting that the Colorado Supreme Court has used "reasonable probability" and "reasonable possibility" interchangeably to describe the harmless error test).[2]

---

[2] In light of the fact the supreme court recently held that the People bear the burden of showing that a trial error was harmless, *James v. People*, 2018 CO 72, ¶¶ 18-19, the harmless error and constitutional harmless error tests now appear identical in Colorado.  *See Hagos v. People*, 2012 CO 63, ¶ 11 (a constitutional error is harmless beyond a reasonable doubt if there is no "reasonable *possibility* that [it] might have contributed to the conviction" (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967))).  This seems counterintuitive: shouldn't it be easier for a defendant to obtain reversal based on a violation of his constitutional rights than for a garden-variety trial error?  But that is not for us to say; we must simply apply supreme court precedent.

## 2. Applicable Law

¶ 14    The Colorado Rules of Evidence govern the admissibility of expert testimony. A witness may offer expert testimony if she has "scientific, technical, or other specialized knowledge" that "will assist the trier of fact to understand the evidence or to determine a fact in issue," and she is "qualified as an expert [based on that] knowledge, skill, experience, training, or education." CRE 702. "Testimony in the form of an opinion or inference" isn't objectionable merely because it embraces an ultimate issue to be decided by the fact finder, CRE 704, but an expert witness can't tell the jury what result to reach or form conclusions for the jurors that they are competent to reach on their own. *People v. McFee*, 2016 COA 97, ¶¶ 76-77. Such impermissible testimony may include applying the law to the facts to reach a conclusion. *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("Generally, the use of expert testimony is not permitted if it will 'usurp . . . the role of the jury in applying [the] law to the facts before it.'" (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991))); *cf. People v. Lawrence*, 2019 COA 84, ¶¶ 30-34 (expert's testimony on materiality didn't usurp the jury's role where expert only "provide[d]

general testimony about when facts might be considered material" and "gave no opinion as to whether [the defendant] committed any of the crimes charged").

¶ 15    In securities fraud cases, expert testimony on whether a particular transaction involved a security is acceptable under certain circumstances, as is testimony on the meaning of materiality and whether certain types of statements or omissions could be considered material. *See, e.g.*, *Lawrence*, ¶¶ 30-34 (expert properly testified about what qualifies as a security, that the contract in question was a security, when a sale of a security is fraudulent, and what facts "might be material"); *Pahl*, 169 P.3d at 182 (testimony that a transaction involved a security and that the defendant's alleged omissions were material didn't usurp the jury's role); *People v. Prendergast*, 87 P.3d 175, 181 (Colo. App. 2003) (the trial court didn't err in allowing an expert to define materiality and to describe securities transactions as "seller beware"); *People v. Rivera*, 56 P.3d 1155, 1164 (Colo. App. 2002) (the trial court didn't err in allowing testimony that an agreement was a security and that certain information the defendant allegedly knew but didn't disclose was material and should have been disclosed). But even such

testimony "risks crossing th[e] line" between "acceptable opinion to unacceptable interference with the court's or the jury's role." *Pahl*, 169 P.3d at 182; *see also id.* (noting that it was a "close question" whether the expert testimony at issue crossed the line).

¶ 16    So where is that line?  It seems relatively clear that an expert witness testifying in these sorts of cases can opine on the requirements of securities laws; the meanings of certain concepts, such as materiality; whether a particular transaction involved a security; and, *if* a certain set of facts is as alleged, whether a particular statement or omission was material, within the meaning of the securities laws.  The decisions by divisions of this court in *Lawrence*, *Pahl*, *Prendergast*, and *Rivera* involved such testimony. Even so, such an expert should not be allowed to opine on whether the prosecution's factual allegations are true — that is, for example, whether the defendant did or did not say or do something, or whether particular events did or did not occur.  Such testimony implicates a weighing of the evidence and determinations of credibility — matters that are for the jury alone to decide.  *See People v. Bridges*, 2014 COA 65, ¶ 11 ("[I]t is solely the jury's responsibility to determine whether a particular witness's testimony

or statement is truthful."); *People v. Duncan*, 109 P.3d 1044, 1046 (Colo. App. 2004) ("[T]he resolution of inconsistent testimony and determination of the credibility of the witnesses are solely within the province of the jury."); *see also Lawrence*, ¶ 33 (the trial court didn't allow the expert to testify "whether there were material misrepresentations"). And, of course, a witness can't be allowed to apply the law to the facts in a way that implies (or expresses) that the witness has determined the defendant's guilt. *People v. Penn*, 2016 CO 32, ¶ 31; *see People v. Lesslie*, 939 P.2d 443, 450 (Colo. App. 1996) (expert witness may not "simply tell the jury what result to reach").

¶ 17    In *United States v. Scop*, 846 F.2d 135 (2d Cir. 1988), for example, the court held that an expert's testimony that the defendants were "active" and "material" participants "in a manipulative and fraudulent scheme" to manipulate stock price in a particular company improperly invaded the province of the jury. The witness repeatedly phrased his opinions in the language of the relevant statutes, expressed conclusions that amounted to determinations of guilt, and indicated that his opinions "were based on his positive assessment of the trustworthiness and accuracy of

the testimony of the government's witnesses." *Id.* at 138-42; *see also Lawrence*, ¶ 34 (the expert witness didn't give an opinion on whether the defendant committed any of the crimes charged, which would have been improper).

### 3. Application

¶ 18     Applying these principles, we conclude that Alves's testimony crossed the line between permissible and impermissible expert testimony in several ways.

¶ 19     After talking about the purpose of the securities laws and explaining the seller's disclosure obligations generally, Alves said that the Attorney General's Office had asked her to review the investigative materials to determine (1) whether there had been "an offer, sale or purchase of a security"; and (2) "whether or not any material omissions or material misstatements *occurred* in the sale of the security." (Emphasis added.) She reviewed the reports of interviews with the investors and persons associated with the promotion (including Baker), financial information compiled by the Attorney General's Office, documents provided to the investors, and perhaps other unspecified documents. Alves then testified at length about (1) what she believed Baker had told the investors; (2)

12

whether Baker's statements were material; and (3) whether the things Baker had promised to the investors had come to pass. And she did so not in hypothetical terms — i.e., *if* Baker did or did not say or do something — but in terms expressing certain conclusions as to what had occurred based on her assessment of the evidence. For example:

1. Alves testified that the investors "were told by the defendant that he would not be taking a salary until Aviara was up and running or until it was profitable. When, in fact, the financial information I reviewed indicated that he took the investor proceeds right away and paid himself. That was clearly a material fact, in my opinion, to tell someone that, I'm going to work for free. . . . I'm not even going to take a salary." And she testified that Baker "took the investor proceeds right away and paid himself."

2. She said Baker "stat[ed] to all investors that there were . . . Class A investors who were poised to invest." But "[i]t did not appear that there were any Class A investors imminent. And that was quite material."

13

3. She testified that Baker "told the investors that [their investment funds] would be held in escrow" but that "there was no escrow account at all."

4. She said, "[T]hey had been told that they would at least get their principal back within one year. So that is another factor that is material."

5. Alves later defended her reliance on the investors' reported statements, saying that since the interview reports prepared during the state's investigation included the same statements from each investors, that "suggest[ed] the statements were consistently spoken by the defendant from investor to investor."

6. She testified that the investigator who interviewed each investor reported Baker's alleged representations to each investor in identical terms. When defense counsel asked Alves whether the investigator should have instead noted "exactly what the witness told" the investigator, she said, "I don't have any reason to believe that's not what they were told."

These statements were improper, for at least two reasons.

¶ 20     First, by saying these things, Alves told the jury what had happened in the case. Though Alves didn't specifically tell the jury that she thought the investors were telling the truth, she spoke as though their allegations were true, which suggested that she had drawn her own conclusions about the investors' credibility. And she phrased her opinions about what had happened definitively, as though there was no dispute that what she relayed was true. But these facts were largely disputed: Baker's theory of defense was that he never made the alleged statements to the investors. So whether the investors were telling the truth about what happened was a matter solely for the jury's determination. *Duncan*, 109 P.3d at 1046.

¶ 21     Second, Alves's testimony on whether the alleged statements were material went too far. Though generalized conclusions about what types of statements an investor could find material are acceptable, such testimony may be improper if, as in this case, it assesses witness testimony, indicates a belief in a particular version of the facts, and then applies the law to those facts to make conclusions reserved for the jury. *See Scop*, 846 F.2d at 142.

¶ 22    We further conclude that the district court's error wasn't harmless with respect to Baker's securities fraud and theft convictions.[3] Alves testified that she based her conclusions in part on information not shared with the jury, including Baker's interview with investigators, thereby implying that she knew more about the facts than they did. Despite the fact Baker disputed the allegations about what he had said, Alves testified about them with authority and as though they were fact. And she then told the jury that the statements Baker had made (not was alleged to have made) were material; therefore, by necessary implication, she opined that Baker was guilty.

¶ 23    The danger that the jury credited Alves's improper opinions is especially acute given that she testified as an expert, was employed by the State (and, as she told the jury, was "part of the process for

---

[3] Alves's objectionable testimony, as discussed above, related to statements that Baker allegedly made to each investor, and therefore related to each securities fraud and theft charge. The error was harmless, however, with respect to Baker's conviction for filing a false tax return. None of Alves's objectionable testimony related to that charge, and none of the alleged statements that Alves attributed to Baker formed the basis of that charge. In fact, Alves didn't mention taxes at all. The prosecution called a different witness to testify about tax fraud.

selecting the cases for enforcement" and "one of the decision-makers who decides whether it's going to be administrative, civil, or a criminal case"), and testified as to technical matters about which the jurors were likely to afford her particular credibility. *See People v. Koon*, 724 P.2d 1367, 1371 (Colo. App. 1986) ("[T]he therapist's status as an expert witness augmented her [improper] testimony with an aura of trustworthiness and reliability."); 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 702.02[5], at 702-21 (2d ed. 2015) ("In jury trials, the danger of prejudice resulting from the presentation of expert testimony is significant, because of the potential for the jury to automatically accept an expert witness's testimony."); *cf. United States v. Montas*, 41 F.3d 775, 781-84 (1st Cir. 1994) (case agent's improper testimony put "the expert's stamp of approval on the government's theory"); *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991) (trial court erred by allowing IRS agent to give expert opinions based on inferences from the evidence and credibility determinations), *amended*, 957 F.2d 301 (7th Cir. 1992); *Domingo-Gomez v. People*, 125 P.3d 1043, 1052 (Colo. 2005) (prosecutor's remark about a "screening process" implied that the State didn't consider the

particular case weak and encouraged the jurors to "rely on the prosecutor's judgment instead of their own convictions"); *People v. Mendenhall*, 2015 COA 107M, ¶¶ 54-56 (district attorney's investigator's testimony about how many potential cases he reviewed each year and how many of those cases resulted in charges was impermissible "screening" testimony).

¶ 24 The People argue that any error in admitting Alves's testimony was harmless because the court instructed the jurors that they could accept or reject Alves's testimony, defense counsel fully cross-examined her, and the prosecutor didn't emphasize any of Alves's implicit credibility determinations in closing arguments. But considered in light of so many improper statements, and in light of Alves's expert status, we aren't convinced that these safeguards were sufficient. We therefore conclude that there is a reasonable possibility that Alves's improper testimony contributed to Baker's securities fraud and theft convictions.

B. Variance

¶ 25 Next, Baker contends that the district court erred by allowing the prosecution to present evidence that he had told Donna Taylor that he would register the securities, when that allegation wasn't

18

included in the indictment and the People hadn't charged him with selling unregistered securities. In turn, Baker argues, this error led to another error: allowing Alves to testify about "blue sky filings" and to tell the jury that the "general rule" is that someone selling a security in Colorado must register it.

¶ 26    We choose to address this issue because it is likely to arise on remand.

¶ 27    We review de novo whether a variance occurred. *People v. Rail*, 2016 COA 24, ¶ 48 (*cert. granted on other grounds* Apr. 10, 2017). Because defense counsel preserved this issue by timely objecting to the evidence on this basis,[4] we reverse only if any error wasn't harmless. *See Hagos*, ¶ 12.

---

[4] The People argue that this issue wasn't preserved because Baker "didn't argue that this testimony created a prejudicial variance on the securities fraud charge relating to the Taylors." So, they say, we should review for plain error, not harmless error, when a party "alters the grounds for his objection on appeal." True, defense counsel never used the term "variance" in his objections. But he did say that "there is absolutely no charge that [Baker] improperly sold unregistered securities" and "it's not alleged to be one of the alleged false statements that he made." That was close enough to preserve the issue. *See Rael v. People*, 2017 CO 67, ¶ 17 ("We do not require that parties use 'talismanic language' to preserve an argument for appeal.").

¶ 28     A simple variance occurs when "the evidence presented at trial proves facts materially different from those alleged in the charging document." *People v. Smith*, 2018 CO 33, ¶ 25.  In such a case, reversal is generally not required unless the variance prejudiced the defendant's substantial rights.  *See id.*; *Pahl*, 169 P.3d at 177.  A defendant fails to establish prejudice if he does not allege that he would have challenged the prosecution's case differently or that he could have produced different evidence in his defense.  *Pahl*, 169 P.3d at 178.

¶ 29     There was a simple variance in this case.  At trial, the prosecution presented evidence that Baker had said that he *would* register the securities.  But the indictment alleged that Baker "indicated to at least one investor that he did not believe he needed to file or register the security."  The two allegations are materially different; indeed, they arguably conflict.

¶ 30     But the variance doesn't require reversal because it didn't substantially influence the verdict or prejudice Baker.  Baker argues that he was not prepared to respond to the allegation that he told Donna Taylor he would register the securities.  Yet, he doesn't explain *how* he would have challenged the prosecution's case

differently had he known about this allegation ahead of time. *See id.* Baker's case focused on showing the jury that he didn't say or would not have said the things the victims alleged, and that he had provided the victims with accurate information on paper. And defense counsel attacked the registration allegation the same way.[5] Under these circumstances, and in light of the other alleged material misstatements and omissions, we don't see how this variance substantially influenced the verdict or prejudiced Baker's substantial rights.

## C. Amelioration

¶ 31     Last, Baker argues that we should reduce one of his theft convictions (count 4, theft of over $20,000 from Ng) from a class 3 felony to a class 4 felony pursuant to section 18-1-410(1)(f)(I), C.R.S. 2019 (postconviction relief is available where there has been a significant change in the law affecting the applicant's conviction or sentence). Because we reverse all of Baker's securities fraud and

---

[5] For example, during closing argument, defense counsel argued that it didn't make sense for Baker to promise to register the security "when literally every single document that he provided [to Donna Taylor] clearly indicates that this is not going to be registered."

theft convictions, this argument is moot. *See People v. Denhartog*, 2019 COA 23, ¶ 70 (reversal of conviction renders moot a challenge to the sentence for that conviction).

## III.   Conclusion

¶ 32     Baker's securities fraud and theft convictions and sentences are reversed.  The case is remanded for a new trial on those counts. In all other respects, the judgment is affirmed.

JUDGE FOX and JUDGE TOW concur.