22CA2201 Peo v Abcug 06-05-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA2201
Douglas County District Court No. 19CR1074
Honorable Patricia D. Herron, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Cynthia Lee Abcug,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE FOX
Harris and Schutz, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced June 5, 2025

---

Philip J. Weiser, Attorney General, Brenna A. Brackett, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Esteban A. Martinez, Alternate Defense Counsel, Longmont, Colorado, for Defendant-Appellant

¶ 1    Defendant Cynthia Lee Abcug appeals her convictions for conspiracy to commit second degree kidnapping and child abuse, arguing that an expert's testimony related to the child abuse charge usurped the role of the jury and the court.  We affirm Abcug's convictions.[1]

## I.    Background

¶ 2    Shortly after her son, C.R., was born in February 2012, Abcug began reporting that C.R. was experiencing medical issues.  Abcug twice took C.R. to the emergency room for reported seizures, and C.R. was prescribed an anti-seizure medication.

¶ 3    In the fall of 2017, C.R. was referred to neurology specialists with the Children's Hospital of Colorado.  Neurologists observed that C.R. had had several "abnormal" EEG tests, but they did not diagnose him with a seizure disorder.

¶ 4    That fall, C.R. started kindergarten.  Abcug told the school principal that C.R. had a "seizure disorder," a potentially fatal heart condition, and a "muscular skeletal condition" that could cause

---

[1] Because this appeal only concerns testimony related to the child abuse charge, we have omitted discussion of the conspiracy to commit kidnapping charge.

spontaneous weakness and required C.R. to wear leg braces. The principal and the school nurse, however, saw no signs of any medical conditions; to them, C.R. appeared to be a highly energetic child in "excellent health." Abcug resisted the school's efforts to obtain full medical records and to speak with C.R.'s specialists. In October 2018, Abcug withdrew C.R. from school.

¶ 5     Meanwhile, Abcug enrolled C.R. in physical therapy. She told the physical therapist that C.R. was suffering from a fatal "brain tumor," "vascular Ehlers syndrome," spontaneous collapses, and seizures. The physical therapist, who described C.R. as "generally a fairly healthy kid," requested documentation for these diagnoses, but Abcug never provided any, so in January 2019, the therapist reported his concerns to the Department of Human Services (DHS).

¶ 6     DHS then met with Abcug, who told them that C.R. "was terminally ill" and had "several diagnoses, such as brain tumors, the potential for a connective tissue disorder, seizures, epilepsy, [and] autism." Several months later, DHS removed C.R. from Abcug's care and placed him with a foster family. After the removal, C.R. had no recurrences of the reported medical issues and doctors could not substantiate the alleged diagnoses.

¶ 7      The prosecution charged Abcug with conspiracy to commit kidnapping and misdemeanor child abuse, alleging, with respect to the latter charge, that she had caused C.R. harm by subjecting him to unnecessary medical treatment.

¶ 8      At trial, the prosecution presented testimony from Dr. Jessica Panks, an expert in "medical child abuse and pediatric child abuse." Panks described her involvement with C.R.'s treatment and her expertise in diagnosing and treating medical child abuse. She explained that "medical child abuse" "is a particular type of abuse where the harm to the child is actually the medical system," which occurs when a parent or caregiver subjects a child to unnecessary treatments. She testified that despite reassurances by medical professionals, Abcug may have been misinterpreting or "exaggerating" C.R.'s medical conditions, and that Abcug's accounts of C.R.'s symptoms did not align with those of the medical professionals and others.

¶ 9      During direct examination, the prosecutor asked Panks, "Did you form an opinion in this case about whether or not [C.R.] was subject to medical child abuse?" Panks answered, "His presentation is most consistent with medical child abuse."

¶ 10    The jury convicted Abcug as charged.

## II.    Issue on Appeal

¶ 11    On appeal, Abcug contends that Panks usurped the roles of the jury and the court because Panks "defined" medical child abuse and testified that C.R.'s "presentation [was] most consistent with medical child abuse."  Abcug argues that this testimony effectively told the jury what conclusion to reach, and Panks' definition of medical child abuse usurped the court's duty to correctly instruct jurors on the law.[2]

¶ 12    The People contend Abcug waived any objection to the challenged testimony because the defense explicitly conceded that experts could testify about medical child abuse.

---

[2] In two sentences, Abcug also asserts that Panks improperly commented on Abcug's truthfulness, citing one instance where Panks discussed concerns about Abcug misrepresenting or exaggerating C.R.'s symptoms with doctors and school employees. Abcug adds that the prosecution "amplified" this testimony by introducing a Kempe Center report that noted discrepancies in what Abcug was telling different medical professionals.  Abcug also claims that the evidence was weak and resulted in convictions "more theoretical than factual."  Because these arguments are undeveloped, we do not address them.  *See People v. Draper*, 2021 COA 120, ¶ 85 n.9, *overruled on other grounds by Garcia v. People*, 2023 CO 30; *see also People v. Montgomery*, 2014 COA 166, ¶ 6 (we do not address underdeveloped arguments "replete with conclusory statements supported by little or no case law").

4

¶ 13    We agree with the People.

### III.   Analysis

#### A.    Standard of Review and Waiver

¶ 14    "Under CRE 704, a witness may offer testimony that embraces an ultimate issue of fact but may not usurp the function of the jury." *People v. McMinn*, 2013 COA 94, ¶ 51.  Generally, because the district court "has broad discretion to determine the admissibility of expert testimony," if the issue was preserved we review whether an expert's testimony usurped the jury's or the court's roles for an abuse of discretion, and for harmless error if an error occurred.  *People v. Baker,* 2019 COA 165, ¶¶ 11-13, *aff'd,* 2021 CO 29.  "A trial court abuses its discretion if its decision is manifestly arbitrary, unreasonable, or unfair, or if it misapprehends or misapplies the law." *Id.* at ¶ 12.  If unpreserved, we review such claims for plain error.  *See McMinn*, ¶¶ 41-42; *see also People v. Rector*, 248 P.3d 1196, 1202-03 (Colo. 2011).  "Plain error review addresses error that is obvious and substantial and that so undermines the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction." *McMinn*, ¶ 42.

¶ 15     Whether a claim has been waived, however, requires the "intentional relinquishment of a known right or privilege," a high bar because "a waiver extinguishes error, and therefore appellate review." *People v. Rediger*, 2018 CO 32, ¶ 40.  As a result, "[w]e 'do not presume acquiescence in the loss of fundamental constitutional rights, and therefore indulge every reasonable presumption against waiver.'"  *Id.* at ¶ 39 (citation omitted).

### B.     Waiver Analysis

¶ 16     We conclude that Abcug waived her claim that the court erred by allowing the prosecution's question, "Did you form an opinion in this case about whether or not [C.R.] was subject to medical child abuse?" and Panks' response that "[C.R.'s] presentation is most consistent with medical child abuse."

¶ 17     The issue first arose at a pretrial hearing, where the prosecution and the defense debated Panks' proposed testimony and whether she could testify about medical child abuse or "Munchausen by proxy."  The defense began the hearing by challenging the prosecution's summary of its expert's testimony and argued the summary did not provide enough information to detail their specific opinions, that the opinions would be confusing and

irrelevant, and the expert would improperly opine on witnesses' credibility by expressing concerns with Abcug exaggerating C.R.'s symptoms. The prosecution responded by highlighting that medical child abuse and Munchausen by proxy diagnoses include whether a caregiver is fabricating or exaggerating a child's symptoms, resulting in unnecessary medical care. Therefore, the expert had to be able to testify to any concerns that Abcug exaggerated or fabricated symptoms because this is part of a medical child abuse diagnosis.

¶ 18     The defense countered that the jury should be permitted to determine whether Abcug was exaggerating C.R.'s symptoms, and the prosecution noted that the jury would be instructed that it would be free to believe the expert's testimony or not and decide what weight to give the testimony. The defense summarized its objection by stating that "information about an expert opining as to whether or not [Abcug] was exaggerating . . . it's those words, Your Honor, that we are really objecting to." The defense added that it also objected to "anybody referring to Munchausen by proxy."

¶ 19     The prosecution stated,

Judge, I agree, there's no one who's going to testify that they have diagnosed Ms. Abcug with Munchausen by proxy; however, the conclusion of the doctors, both in the reports and in the Kempe Center report, is that this child suffered from medical child abuse. And as I just read a few minutes ago, the definition of medical child abuse is exaggeration of symptoms or fabrication of symptoms.

¶ 20 Focusing on medical child abuse specifically, the court asked for a response. The defense stated,

Your Honor, we think 'medical child abuse' is fair game. And . . . I understand the experts are going to be coming in saying those types of things, and that is fine. . . . While 'medical child abuse,' Your Honor, we believe is fair game, the definition of medical child abuse is different than the definition of child abuse that we have in our criminal laws. So while I don't disagree with [the prosecution] about those definitions . . . . I do think that we cannot confuse the jurors by telling them, necessarily, medical child abuse is the definition of child abuse pursuant to the laws here in Colorado.

¶ 21 The prosecution then represented that, pursuant to *People v. Weeks*, 2015 COA 77, ¶ 90, its experts would testify to "whether a child's injuries constitute medical child abuse" but they would not testify "that it is legal child abuse" and the jury would be instructed that it could accept or reject this opinion. The defense responded,

I'm not saying he can't say the words 'medical child abuse.' Our concerns with that interplay of 'child abuse' and 'medical child abuse,' [the prosecution] addressed that. . . . So as far as the Munchausen by proxy, Your Honor . . . we would like the Court order that no individuals are allowed to make that diagnosis, make those statements, say 'Munchausen by proxy.' 'Medical child abuse,' like we said, fine, no objection to that. But Munchausen by proxy is a mental health diagnosis on an individual that we do not believe should be brought up during the trial.

¶ 22 The prosecution agreed and stated that it would instruct its witnesses not to mention Munchausen by proxy.

¶ 23 In light of this pretrial exchange, and given that the defense did not object to the challenged testimony at trial, we agree with the People that the issue on appeal has been waived and may not be reviewed.

¶ 24 Before trial, the defense and the prosecution came to an explicit understanding. The defense was concerned with the prosecution's witnesses implying that Abcug had lied, and the prosecution responded that making a medical child abuse diagnosis would require their witnesses to comment on whether they believed Abcug was fabricating or misrepresenting C.R.'s symptoms. But the prosecution represented that its witnesses would not opine on

9

whether Abcug committed legal child abuse or diagnose Abcug with Munchausen by proxy. As a result, the defense concluded that its concerns had been addressed and stated that expert testimony on "medical child abuse" was "fair game" and "fine," and explicitly stated that it had no objections to this testimony so long as no witness diagnosed Abcug with Munchausen by proxy or testified that she committed legal child abuse.

¶ 25   The record therefore establishes that the defense deliberately chose not to challenge Panks' medical child abuse diagnosis testimony after a lengthy discussion on the subject, and with a clear awareness of the concerns with experts usurping the jury's role by opining on legal child abuse. *See Forgette v. People*, 2023 CO 4, ¶ 28 ("A waiver may be explicit, as, for example, when a party expressly abandons an existing right or privilege or it may be implied, as when a party engages in conduct that manifests an intent to relinquish a right or privilege or acts inconsistently with its assertion."). Abcug cannot now argue that Panks usurped the jury's role by stating that C.R.'s "presentation is most consistent with medical child abuse." That testimony is exactly what the parties agreed, before trial, was permissible.

¶ 26    Abcug, however, notes in her reply brief that on the first day of trial, before jurors had been selected, this issue came up again and argues that the defense again objected to the testimony challenged on appeal.  But the record does not support this contention.  In the discussion Abcug highlights, the defense objected to a portion of the Kempe Center report detailing harms C.R. sustained on the grounds that mentions of Munchausen by proxy should be excluded.  The defense argued that, while Pank's testimony was admissible, the report itself and testimony diagnosing Abcug with Munchausen by proxy or a "factitious disorder" should not be admissible.  The defense specifically asked the court to make a ruling that Panks "can't opine on . . . [medical child abuse] possibly causing [C.R.] damage further on in his life based on some type of factitious disorder."

¶ 27    The prosecution, noting there was a "fine line" on this issue, agreed that Panks would not testify to Abcug's conditions and agreed to redact the challenged portions of the report.  But the prosecution insisted that Panks could testify to the harms C.R. sustained from medical child abuse and "how it may affect him down the road."

11

¶ 28     The defense responded:

> Well, how about if we do this. Number one, we can talk about getting rid of that . . . [section of the report]. . . . When [Panks is] on the stand, you know, *I am certainly going to be renewing this objection.* I don't think that she should be able to opine on that. *I know we had previously objected to the finding of medical child abuse by her*, and the Court has ruled that it is admissible at the previous . . . pretrial conference. So I understand that ruling.
>
> *I was going to renew the objection today, just for the record.* But I understand the Court's already ruled on that. So as long as it is not a basis that they're saying that her Munchausen by proxy or her factitious disorder would cause him to have issues down the line, I think we can deal with the rest with the witness on the stand.

¶ 29     (Emphasis added.) It is this emphasized language that Abcug argues in the reply brief shows the defense "objected to Dr. Panks testifying about medical child abuse."

¶ 30     At trial the defense objected to the admission of the report entirely, arguing it duplicated expert testimony and was hearsay. The court deemed the report admissible, but indicated it would only send it back with the jury if requested. The parties also agreed to various redactions.

12

¶ 31    Reviewed in context with the pretrial hearing and the objections at trial, the objection Abcug highlights in the reply brief was not to Panks testifying about medical child abuse generally, nor did the defense argue that Panks could not diagnose C.R. with medical child abuse.  Like in the pretrial hearing, the defense's objection was to testimony that implied that Abcug had lied or been untruthful, adding objections to testimony about future harms C.R. might suffer.  But in the pretrial hearing the defense and the prosecution agreed that Panks' discussion of medical child abuse was admissible; thus, the objections the defense renewed in the highlighted discussion is not the same contention Abcug now raises on appeal.  And again, the defense never objected to the testimony now challenged on appeal.

¶ 32    Therefore, we conclude that Abcug has waived any objection to the challenged testimony because the defense knew of this proposed testimony, explicitly stated that it had no objections after discussing the issue at length, and never objected to it at trial.  As a result, we may not review this issue on appeal.  *Compare Rediger*, ¶¶ 41-44 (no waiver where counsel stated he was "satisfied" with jury instructions despite discrepancy with charging documents

13

when no evidence showed that counsel was aware of the discrepancy and the record showed no discussion on the instruction at issue), *with Forgette*, ¶¶ 31-35 (challenge to a sleeping juror was waived when counsel was "fully aware" of the issue but did not take any action to address the issue or object even after the court explained how it had addressed the problem), *and Stackhouse v. People*, 2015 CO 48, ¶ 17 ("Defendants in Colorado affirmatively waive their right to public trial by not objecting to known closures.").

## IV. Disposition

¶ 33    We affirm Abcug's convictions.

JUDGE HARRIS and JUDGE SCHUTZ concur.